Good morning, ladies and gentlemen. This is Judge Easterbrook. Judge Brennan and I are present in the courtroom in Chicago, and Judge Hamilton is participating remotely, as are all the attorneys. The fact that we are all present just vocally rather than in person may make it difficult to know when one person is talking and another wants to jump in. If there seem to be multiple people talking at a time, I may intervene to call a halt, and we will get things back on track. We have so far been very successful with the technology, but if something goes wrong, we will get it fixed at no cost to any of the attorneys' allocations of time. Finally, I want counsel to know that I will do my best to remember to remind you at the time reserved for rebuttal and when a minute or two is left in the argument. That may be imperfect, but you'll get notices sometime close to that. And so we now begin with our first case, Mlsna v. Union Pacific Railroad. Mr. Hanson. Good morning, and may it please the Court, Adam Hanson on behalf of Appellant Mark Mlsna. With me today is Nick Thompson, also on behalf of Appellant Mlsna, and Barbara Sloan on behalf of the EEOC appearing as amicus. This case concerns an employer's overbroad and in some cases outright discriminatory policies targeting hearing impaired employees. The appellant in this case, Mark Mlsna, is an experienced train conductor who happens to suffer from but rather because he failed to run the gauntlet of his employer's increasingly more restrictive qualification standards. Understand this. Any way you look at this case, Mlsna can do his job as a train conductor. He can do his job wearing hearing aids and no hearing protection as he did for nearly a decade. He can do his job wearing hearing aids underneath standard hearing protection, and he can do his job wearing any of a number of amplified hearing protection devices. Mr. Hanson, I thought his own expert conceded that it would be inappropriate to wear hearing aids under hearing protection. That assertion requires some additional explanation. Judge Easterbrook, his experts did agree that it would be inappropriate to wear hearing aids underneath an amplified hearing protection device. That is, essentially wearing two amplification devices at the same time. They did not express any discomfort with wearing a hearing aid under a standard regular old earmuff protector that you would buy at the hardware store. The district court's error in this case was twofold. First, the district court incorrectly treated every last element of Union Pacific's qualification standards as essential functions as a matter of law. And second, the district court excused Union Pacific's failure to engage in the interactive process in a way necessary to identify a reasonable accommodation. Mr. Hanson, this is Judge Brennan. I have a question with regard to the first half of the analysis, the essential function analysis. With regard to the representative sampling requirement, the argument you've offered is that since 2001 there have been no instances in which the noise level got above 90 dBA. And in the record there is some raw data going back a number of years with regard to instances when the dBA may have exceeded 85 but still been less than 90. My question goes to where does one draw the line between representative and unrepresentative sampling? That's a good question. I have not thought about that. You know, certainly the concept of representative sampling is defined in the regulations. And it just says, I'm paraphrasing, but it says that you should look at exposures for employees in a typical operating environment or typical operating condition. And it's the employer's obligation to do this. And so I don't think there's any allegation from any party here that this data is somehow unrepresentative. Our qualm is exactly what you've already identified, which is this is a regulatory requirement that came online in 2007. It's really inappropriate to rely on data from principally the 1980s and the 1990s that showed that conditions were much noisier back then. They were noisier back then because that was before the FRA comprehensively regulated these noisy locomotives out of existence. Well, I take it your argument is that because the 227.115 C and D requirements are not satisfied that therefore, whether hearing protection is an essential function of the conductor position, we should answer no. I think in your brief, you indicate the district court you believe was incorrect on that. And you asked for a remand on that basis. Is that your argument? That is our argument. So just to just to rephrase it, make sure it's crystal clear. We agree that meeting the FRA minimum requirements is an essential function. Everything above and beyond the FRA minimum requirements is a non-essential function. And that doesn't mean that the railroad can't impose those requirements. It just means you proceed past step one under the ADA and you have to look at things like reasonable accommodations and so forth. The thing about essential functions is it's really a threshold question under the ADA and its employers love it so much because it kills cases in their tracks at an employer could can do legally is an essential function. Of course, essential functions have to be really fundamental attributes of the job. And here, I think the reasons that we've already touched on, that's just not the case. The sampling data doesn't support it. The job description doesn't support it. The part of the job description that talks about hearing protection is not listed under the section that defines essential functions. And then really the most important criteria is the real world experience of these employees on the ground. And Milsma consistently testified that he did his job without hearing protection and so did everyone else who worked around him. If I may, I'd like to move on to the district court's second error on the essential functions analysis. And really this is a more grievous mistake. And that was holding the union. I'm sorry, was there a question? Mr. Hanson, your time is short. I think it might help you to spend some time on the accommodation question rather than continuing to talk about essential functions. I would be more than happy to do that. Let me just let me just summarize the second point on essential functions because it is important. And then I promised the court I will proceed on to the reasonable accommodation point. With respect to the hearing exams, the problem is twofold. These are exam protocol is based on a fundamental misreading of the regulations, which say, without exception, that a person can pass the hearing exam with or without a hearing aid. Mr. Hanson? Mr. Hanson? Yes, Judge Hamilton. On this point, is it correct that your argument in this case is that it is that passing the FRA test with a hearing protective device on is not an essential function because it is not applied to every worker? That is our argument. And the reason you identify is really one of several reasons why that argument is the correct one. And just to pick up on that point before moving on, that's a if you're arguing as an employer that something is essential, at a minimum, that something has to be applied to everyone. But what we have here is a discriminatory regime. If someone passes the hearing exam unaided, they're considered good to go. They're certified. They're on the job. No one then turns around and says to those people, please put on your hearing protectors. Let's test you different. They have to pass the test wearing hearing protection and not just that with the single hearing protection device that Union Pacific has selected, which violates not just the ADA, but also the FRA regulations that specifically say there needs to be a wide variety of hearing protectors and a wide variety of attenuation devices. So really, with respect to the second category, Judge Hamilton, it's not just the ADA factors that support our conclusion. It's the fact that this is really a discriminatory regime. And such a regime, of course, can never be an essential function. All right, a little delayed, but as promised, let me move on to the reasonable accommodation points. The core argument here is that this employer, or really any employer, can't do what a business might find to be convenient. And that's just sit back, tell an employee, please come up with whatever you can. We'll review it. We'll give you a thumbs up or a thumbs down. And if we give you a thumbs down, feel free to go back to the drawing board and come up with something else. The ADA has this requirement. Hanson, this is Judge Hamilton. Both you and the EEOC have made that point clearly and persuasively as far as I'm concerned with the interactive process. But in the end, it's still the plaintiff's burden in such a case, given considerable latitude by a failure to engage anybody at work, but still your obligation to come up with evidence of an accommodation that would work. What's the best evidence you presented in a timely fashion to the district court on that issue? Sure. So the starting point, of course, is the device that the plaintiff himself suggested, the EarPrimo device. And there's evidence in the record that that device would have been a reasonable accommodation. Union Pacific rejected it for a wholly unsupported reason, which is the lack of this so-called NRR, or noise reduction rating. And as we explained in the brief, this was... Mr. Hanson. Yes. The Union Pacific rejected it and said, well, we don't think it will work well enough. I'm interested in what would happen if the Union Pacific allowed your client to wear that device, and its worst fears turned out to be true, if it didn't turn out to be protective enough, and your client suffered hearing loss. Would your client then have a tort claim, or an FELA claim, or a Railroad Safety Act claim against the railroad? He would not, Your Honor. The FELA cases that Union Pacific relies on, none of those cases arise in the context of a request for a reasonable accommodation. So I'm comfortable in saying that if a plaintiff asks for this under the ADA, that's an assumption of risk. There's no tort liability. Let's be more concrete. Is your client willing to sign a formal waiver of liability in the event the accommodation he proposed, if accepted by the railroad, proves to be inadequate? I have not asked that question. I think it's something that I would certainly, as his counsel, recommend. I don't think there would be any issue with that. Yeah, well, recommending may not be enough. Right? If you're, the railroad says, we have a device that will protect hearing, and if our device fails, we're liable. It seems to me the mirror image is, the worker says, no, I've got a thing as a concrete agreement. I'm, I can update my answer from trial counsel and assure the court that yes, the plaintiff, Mr. Millicent would agree to that. And I would just add, I see that I'm out of time. So let me just conclude in answering this question. I'll take my time on rebuttal. I would conclude by saying that Mr. Hanson, and that is, I'd like to ask you one other quick question, and that is, what was the practical effect of the Federal Railroad Administration decision about his certification? Well, so far, it's had none, because the district court said it's irrelevant. But it certainly should have an effect. You know, it's essentially done away with the sole argument that that Union Pacific made below, which is that, hey, we had no choice. We only disqualified this person because we couldn't certify him under the federal regulations. That argument is now out the window. And Union Pacific is essentially claiming for the first time before this court, that it was just enforcing a more stringent policy. So that's waived. That's incorrect. I think there are a number of problems with that. But that, Your Honor, I think would be the import of the FRA's ruling. And of course, even if that hadn't happened, I think this court sensibly would have reached the same result. I'll reserve the rest of my time. Thank you, Mr. Hanson. Ms. Sloan. May I please support Barbara Sloan for the EEOC? Sounds as if this court is not particularly interested in our first issue, which is the interactive process. Our big concern with that was that the employer, the district court said that they plaintiff that the employer is not satisfied. It's a burden to engage in the interactive process by essentially being passive. But that's completely contrary to the whole point of the interactive process. Ms. Sloan, other than that horrible bureaucraties interactive process, which can't be found anywhere in the statute, I would like you to be concrete about what the employer's duty is. How much would the employer have to pay to conduct a test of the EAR Primo device? Right? The EEOC says, well, you can't just say the package doesn't provide the information we're looking for. So take a flying leap. The Then we need to be concrete about how expensive. Does the railroad have to devise a double blind medical study with 500 or 1,000 participants and see what happens over a 10 year period? What concretely has to happen? The statute has a limit. It says undue hardship, no undue hardship. The employer doesn't have to provide an accommodation which would cause undue hardship. So if you're talking about massive double blind testing, I think the employer might have an argument that it's undue hardship. Although the plaintiff, the defendant here hasn't raised an undue hardship. Could you be concrete? What should the railroad have done? It doesn't like the fact that there's no particular claim on the box about 30 decibels of protection. Fine. What concretely should the railroad have done next to try to find out whether these EAR Primo devices would suffice? The employer wasn't limited to the EAR Primo device. What the regulations and the guidance is designed to do is to encourage both parties to come to the table and talk about what would work. Yeah, I'm trying to encourage the EEOC to come to the table. And instead of talking in very high level abstractions, say what the employer ought to have done. Concretely. What the employer ought to have done is talk to the plaintiff. And together, they'll work out what would work. And how do you... I'm sorry. Go ahead, David. Judge Hamilton, could I follow up a little bit here? The employer in its termination letter to Mr. Milsner said it had carried out an extensive search to find an adaptive device that would allow him to hear a reasonable standard. Yes, we agree. It would be a reasonable standard. But the employer agreed, conceded in its discovery that it didn't do that. Well, to go back to Judge Easterbrook's question, the device the plaintiff suggested, as I understand it, cost several thousand dollars. And presumably, you'd have to test it on the plaintiff to find out whether it actually provides sufficient protection, right? True. So is it a reasonable accommodation to expect the employer to spend several thousand dollars for a test that might not work? Well, to be clear, the commission hasn't taken a position on whether any of these accommodations are good. We're concerned with the law, which is that the court messed up on what an interactive process consists of. And the corollary ruling that the only accommodations that are proposed during the interactive process should be considered. Those parties need to talk. And there's no rule at all. And an employer is required to use its expertise where it has the information, correct? Just as a plaintiff or an employee is required to come forward with information about his or her limitations. Exactly, Your Honor. And it would appear that in this case, if the employer had resources, that had it only used them, they would have been able to come up with some proposals because they've been providing accommodations. They have a unit to do that. They have a doctor on board. Then there appear to be devices out there that would work if they'd only looked, which they didn't. Which device do you think is most appropriate? Well, Your Honor, the commission hasn't taken a position on whether any of the devices are appropriate. Our concern is with the legal analysis here. Understood. Thank you, Ms. Sloan. Mr. Moore. Thank you, Your Honors. May it please the court. My name is Scott Moore, and I represent the Appleby Union Pacific Railroad Company. Let's be clear. As we sit here five years, over five years from the date that Mr. Milsner requested a reasonable accommodation, neither Mr. Milsner, nor any of his experts, nor anyone else has been able to identify a reasonable accommodation that would allow Mr. Milsner to perform the essential functions of job as a conductor for the Union Pacific. So, Mr. Moore, in the district court, you led off your argument for summary judgment by saying that Mr. Milsner was fired because he failed a federally regulated hearing test while wearing mandatory hearing protection. Does the FRA auditory acuity test require the employee to pass the test with a hearing protection device on? The short answer to that is there are two regulatory requirements that are applicable here. There are the hearing acuity requirements and the noise attenuation. Mr. Moore, that is not the short answer. The short answer, I believe, is no. For that portion of that regulation, the answer is no. However, that's the test for which you flunked it, right? My follow-up question is whether Union Pacific requires all conductors to pass the FRA auditory acuity test with hearing protection on. The answer to that is no. And all conductors are required to pass the hearing test with or without hearing aids. However, the other equally important protection here in regulation is protecting the conductor's hearing, which I think it is undisputed that Union Pacific has an obligation to protect the conductor's hearing by having them wear hearing protection. Could you address the hypothetical and maybe not so hypothetical that is in Plaintiff's reply brief at page 25 and page 26 of a conductor with moderate hearing loss? Let's say the better ear has a loss of 30 decibels. Would such a conductor be required to – and that conductor passes the FRA test without hearing aids because it's only a 30-decibel hearing loss. Is that conductor required to pass the FRA test also with hearing protection devices on? No. When an individual passes the hearing requirements for the auditory test itself, Union Pacific has already researched and selected the devices that provide hearing protection, they're aware of the noise reduction rating, and they know if a conductor hears within those hearing parameters that they can safely wear the hearing protection. That is already known, and that's why those devices are selected. Mr. Milza, because he's unable to wear hearing aids under any of those hearing protections – and I want to make that very clear. Judge Easterbrook, you asked that question. Didn't the experts agree that he could not wear hearing aids under the hearing protection? And the answer to that is yes. The questions that were asked in the deposition of his experts were regarding wearing hearing aids under assisted hearing protective devices, but there was no dispute that a person cannot wear hearing aids under hearing protection. It's very clear from Dr. Soley's report, and that's document 393, why that happens. A hearing aid amplifies hearing based upon the amount of noise that's coming to the ear. So if you put a muff over a hearing aid, it's simply going to amplify the sound even more and, in essence, take away any benefit of that hearing protection. Moreover, we know from the record, none of the experts in this case, plaintiffs or defendant's experts, have indicated that Mr. Milza can wear hearing aids under hearing protection. In fact, all of the devices that they presented were assistive hearing protective devices. So it is a misstatement of the record to say that Mr. Milza can wear hearing aids under the assistive hearing devices. So he must wear something that both amplifies the sound and dampens the sound, and that's why he must wear an assistive hearing protective device to pass the test because, in essence, it is a hearing aid. There is no way to meet both standards without him being tested in that scenario, and that's why he's not treated in a discriminatory manner. That, quite frankly, is an affirmative accommodation that allows people like Mr. Milza to, nonetheless, be a conductor despite their hearing impairment because that device is available.  I want to be very clear here that Union Pacific followed the requirements of Part 227 in determining that there is excessive noise by conductors. It followed the regulatory requirements to do a representative sampling, and there's no dispute that they followed the FRA regulations. Mr. Moore, on that front, I asked Mr. Hansen some questions, and I want to ask similar questions to you. The argument is being offered that it's not representative because there have not been instances in excess of 90 dBA since 2001. Our review of the raw data showed, I think, 5 of 43 instances over 85 dBA within the last, say, 2008 or so. Is there an expert report in the record in which opinions are offered with regard to this sampling, or are we just left with the raw data? Your Honor, the plaintiff offered no expert to challenge Union Pacific's testing of the dosimetry data. In fact, their expert, when asked, was in his deposition, Dr. Triangle, and that's at docket entry 46 at 7. Specifically states he didn't review the dosimetry data and wasn't asked for an opinion. So that was not challenged at the district court level. So our first response to this is counsel is testifying and giving expert opinion in his brief to this court, but there is no expert opinion nor evidence that his argument, you could parse the data out, that there are less noisy locomotives used. All those things is testimony that was not offered at the district court level. But what is undisputed is Union Pacific followed the FRA regulation in doing representative sampling, and based upon that representative sampling, came up with a reasonable conclusion that hearing protection should be required. But understand, we also argue, even though we believe there's an FRA basis and we agree that it's an essential function, Union Pacific is not limited to FRA regulations in establishing essential functions. It's very clear that the... Did you, Mr., sorry, Mr. Moore, but did you argue to the district court that you had adopted standards for hearing acuity that were more stringent than the FRA? In some cases, yes. And that is our hearing conservation program. That requires any... I was asking about the acuity test. Because this is where what troubles me is, I don't pick out, this doesn't look like a deliberate bait and switch, but it looks like the grounds for the motion have metamorphosed from the district court to the district court on reconsideration to the court of appeals, in particular because of the FRA's decision. Sure. So, number one, I think it's a distinction without a difference. In other words, it has been consistently argued and set forth to Mr. Milsner, even before the litigation, that he needed to wear hearing protection while meeting the acuity requirements. And I think that's very apparent on the record. A conductor, when they're out in the field, must be able to verbally communicate unquestionably, and they must be able to do that while wearing hearing protection. That has been consistently articulated, and, indeed, that's why the assisted hearing protective device came up. And is that also applied to folks with moderate hearing loss, less severe? If they cannot meet the hearing acuity requirements without hearing aids, then they must be able to show that they can do it with a device that both amplifies the sound and dampens the sound, because that unique condition only comes up for someone who uses a hearing aid because they can't wear hearing aids under standard hearing protection. So is it good enough if somebody has lost 30 decibels of hearing unneeded, and then they're required to wear hearing protection on the job that knocks things down another 30 decibels? Well, first of all, there's no expert testimony that that simple arithmetic is how we calculate what someone can hear under hearing protection. Again, that is an argument made by counsel, but there was no expert opinion offered for that. What's the answer to that? Well, the answer to that is, what I can say definitively on the record, Your Honor, is that if someone passes the minimum hearing acuity requirements as set forth by the FRA without any sort of assisted listening device, then they qualify because Union Pacific has preselected devices that they're comfortable that within the range of hearing that someone can hear, they can wear the protective device and still communicate as the railroad requires. So how much does a standard, for somebody who isn't required to wear hearing aids, how protective does the device have to be? What's the noise reduction rating? Well, we believe the noise reduction rating, and I don't have all of the devices here, Your Honor, so I can't answer that question. But again, the question is not 10 decibels here, 10 decibels there. It is if a person is able to hear within the hearing ranges that the FRA establishes, then Union Pacific, in its experience as a railroad, has determined that a conductor can safely hear with their forms of hearing protection, and they should be given deference in that. Rather than, again, on appeal without any expert evidence trying to parse out that data, the question becomes what evidence was before the district court. Now, part of the problem, though, is we have the evidence before the district court that was put there to respond to an argument that's noticeably different from the employer between the district court and the court of appeals. That's one of the troubling things about this lawsuit. In the sense that the question again becomes, and the question has always been, when a conductor is out in the field and they're out there with hearing protection on, can they hear at a sufficient level to be safe and to protect their hearing? Importantly, as we sit here today, Mr. Milne has not identified a device that allows him to do that. In fact, the only device that he was tested on, the ProEars Gold, he could only discriminate 12% of words when the volume was turned up. So it's very important to look at, rather than looking at things in a vacuum or theoretically, looking at what Mr. Milne was able to do. That is, after five years, he had still not identified a device that allows him to hear at any level close to being able to meet the essential functions of the job while wearing hearing protection. In terms of, counsel, in terms of focusing on what's practical, what do we do with the factual dispute about whether a plaintiff has done his job safely and successfully with his normal hearing aids and without wearing protective devices? He's got 10 years or more without hearing loss, as I understand it. And usually, we pay a lot more attention to the way the job is actually done, rather than written descriptions or rules. That's an excellent question, Your Honor. And all of the evidence shows that Unit Pacific's policies and its operation require conductors to wear hearing protection. What about plaintiff's own testimony? So, firstly, we believe that he made a judicial admission, admitting that. I've read the amended complaint, and I don't see it, because you focused on paragraph 14 and ignored 15 through 20 in making that argument. Well, if we look at the record, Your Honor, Mr. Mosna testified in his deposition that it was important for conductors to wear the appropriate hearing protection devices to protect their hearing. Moreover, Dr. Kloss, his own expert, and this is a docket entry 15 at 47, testified that Mr. Mosna came to him with the muff that he claimed he wore over his hearing aids while working at Unit Pacific, to which Dr. Kloss said that was not advisable. So we have testimony in the record that isn't consistent. And it's very, very important that a self-serving statement that Mr. Mosna chose to, even assuming he chose to ignore this hearing standard, that self-serving statement is not enough if we look at both Bassett as well as Mosby-Meachum, those two Seventh Circuit cases. And importantly, the witnesses that he identified, he identified a fellow trainman that he worked with as a witness. Even that fellow trainman said that is not correct. He wore hearing protection. I saw him wear hearing protection. We were required to wear hearing protection. Then, moreover, we have no idea how much hearing loss Mr. Mosna may have had if he didn't wear that hearing protection from 2007 until 2015. Remember, the FRA did not require testing until 2012. And even then, it grandfathered in conductors for two years before they needed to have any tests done. So there is no way for Unit Pacific to know if Mr. Mosna did have hearing loss between that time period. It is imperceptible on a day-to-day basis to determine whether someone has hearing loss. And because we didn't have the benefit of two tests, we don't know if his hearing was damaged. And that's why this is such an important requirement. Because, indeed, as Judge Easterbrook said, with Unit Pacific, if he loses his hearing, and it's even more important for Mr. Mosna because he has residual hearing, Unit Pacific would be subject to a FELA claim. And as this court said, the ADA does not require employers to be on a razor's edge to maintain an employee who may be unsafe and injure themselves or others, but be in a situation where if they take action, they violated the ADA or, in the alternative, someone has gotten injured. It's extremely important to understand that. And, again, focusing on the record, the evidence that was in the record, not lately disclosed expert reports, not arguments that were made on appeals, but evidence that's in the record. Turning to the accommodation claim, I think it's very, very important to note that this court does not need to reach the EEOC's argument. There has still not been a device identified that will be an accommodation. The two devices that were proposed, one, the EARS device, that was never tested on Mr. Mosna. We have no idea if he can meet the acuity requirements or if it provides the necessary hearing protection. Now, there's been much ado about Unit Pacific looking for an NRR, and if it's not on the box, go pound sand.  Thank you, Your Honor. To be very clear here, the only way for Unit Pacific to know whether something provides sufficient attenuation is to know the NRR. It is not, and even the experts in this case could not come up with an alternative method to measure what the noise attenuation would be, either for this product or the lately disclosed product. Mr. Moore, on that question, if Union Pacific identifies that the noise reduction rating is one of the three methods that's necessary, is that enough? Is that sufficient or is that just necessary? So, one of the three methods of noise attenuation? Yes. The regulations allow Union Pacific to choose any of those three, but it shows the NRR because that is from the manufacturer and they can understand what the noise attenuation is. There are other methods, but the regulations don't require Union Pacific to follow those. The regulations may not, but the accommodation process might, right? Yeah, but again, there's no evidence in the record that using either one of those other noise attenuation requirements would allow sufficient noise protection. And I do want to mention the one issue that the EEOC brings up, that Union Pacific is in a better position to determine the accommodation. This is not a workplace accommodation. This is an auxiliary aid device issue. Mr. Milza has been hearing impaired for decades. He has hearing providers and experts and audiologists. Arguably, Mr. Milza is in a better position to identify a specialized custom device for himself, not Union Pacific. Union Pacific, as any other employer, I see I'm out of time, Your Honor. May I finish my thought? You can always finish answering a judge's question. Okay. And so in that instance, we believe that Mr. Milza is in an equally, if not better position to identify a device. But importantly, they've had five years, extensive discovery, experts, manufacturers. No one to this day has been able to identify a device that will allow Mr. Milza to meet the hearing acuity requirements and protect his hearing. And that is why the district court was correct. I'm puzzled by that last assertion, Mr. Moore, because the district court assumed that such devices had been identified, but the judge said too late. Is it your position that those devices just for sure won't work, even though the district judge assumed otherwise? Your Honor, there was no evidence that they would work. The lately disclosed device that Dr. Milza is in has admittedly never been tested. Okay. We come back. That brings us back to the question, who has a burden of testing? Right. Your position seems to be that the employee must not only identify a device that would work, but test it himself. Rather than having the railroad tested. The railroad would have tested it at the time he requested the accommodation. And it indeed did evaluate it. What we're talking about. Well, we look for the NRR rating, which is the way the FRA directs us to determine whether there's sufficient noise attenuation. What we're talking about here is all right. Thank you. Thank you, counsel. Thank you, Mr. Moore. Mr. Hanson, anything further? I'm satisfied. And I want to leave the court with one last point to summarize and then see my time. Unless the panel has any questions. And that final point is this. If union Pacific. Genuinely cared about all of its conductors. And their ability to satisfy. The FRA. Hearing acuity standard. Then union Pacific would require all of its conductors. To pass. The hearing acuity test. While wearing hearing protection. Union Pacific doesn't do that. It assumes that it's non-disabled employees are good enough. And it doesn't extend the benefit of that assumption. To its hearing impaired employees. This is discrimination. And I would ask the court. Not to bless this discrimination and to reverse. The district court's grant of summary judgment. Unless the court has questions. I will sit down and thank the court for its time. Well, thank, thank you very much, Mr. Henson. And you should know, of course, that on the phone. Nobody knows if you're standing. This case is taken under advisement.